Michael J. Frevola
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
BRYGGEN SHIPPING & TRADING AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Judge Hellerstein

08 CV 00931

---

BRYGGEN SHIPPING & TRADING AS,

    Plaintiff,

    -against-

PETROEXPORT LTD.,

    Defendant.

08 Civ. _____

**VERIFIED**
**COMPLAINT**

---

Plaintiff, Bryggen Shipping & Trading AS ("Bryggen" or "Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Petroexport Ltd. ("Petroexport" or "Defendant"), alleges, upon information and belief, as follows:

1.    This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.    At all times material herein, plaintiff Bryggen was and is a business entity organized and existing under the laws of the Norway and maintains a place of business at Gullskogaarden, Bryggen 47, Bergen, Norway.

3.    Upon information and belief, at all times material herein, defendant Petroexport is and was a business entity organized and existing under the laws of the Cayman Islands with an address c/o M+C Corporate Services Ltd., Ugland House, South Church Street, George Town, Cayman Islands.

4.    On or about April 3, 2007 Bryggen and Petroexport entered into a voyage charter party (the "Charter") to ship a cargo of biodiesel from Houston, Texas to Rotterdam, The Netherlands aboard the LS JACOBA ("Vessel"), which Charter was memorialized via a fixture recap.  The Charter's fixture recap was amended on or about April 23, 2007 ("Amended Recap"). The Amended Recap is annexed as Exhibit 1.

5.    The Charter included the standard ASBATANKVOY charter party terms plus additional clauses and Petroexport's Standard Charter Party Clauses 1 through 24 as amended by the Amended Recap of Fixture dated April 23, 2007.   A true and correct copy of the ASBATANKVOY form is annexed as Exhibit 2 and a true and correct copy of Petroexport's Standard Charter Party Clauses 1 through 24 is annexed as Exhibit 3.

6.    Under the terms of the Charter contained within the parties' Amended Recap, Bryggen is entitled to USD $20,000 per day or pro rata for demurrage in the event that the Vessel is prevented from loading and discharging the cargo within the agreed amount of laytime.

7.    The terms of the Charter state that laytime is established at "175/175 MTPH LOAD/DISCH SHINC REV."

8.    In this case, the net time of the Vessel's loading and discharge exceeded the agreed laytime by 192.57 hours, which at a rate of $20,000 per day establishes damages for

Bryggen in demurrage in the amount of USD $160,475.00. A true and correct copy of Bryggen's demurrage calculation is annexed as Exhibit 4.

9.      The terms of the Charter call for arbitration in New York and U.S. law. Bryggen demanded arbitration and appointed and arbitrator on November 1, 2007, to which demand Petroexport has failed to respond. While all disputes arising out of the Charter are to be arbitrated in New York, the action herein is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure as well as 9 U.S.C. §8, is not and cannot be considered a waiver of the Charter's arbitration clause.

10.     Under Clause 24 of the terms of the standard ASBATANKVOY charter party "[a]wards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees."

11.     Upon information and belief it will take two years to arbitrate this dispute to conclusion, resulting in the following estimated interest and attorneys' fees and costs:

| | |
|---|---|
| Interest: | $  24,071.25 ($160,475.00 x 0.075/year x 2 years) |
| Attorneys' fees | $  60,000.00 |
| Total Principal Claim: | $ 160,475.00 |
| Total Sought: | **$ 244,546.25** |

12.    Petroexport is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of Petroexport Ltd. with, upon information and belief, the following financial institutions:  Bank of America, N.A.; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; or any other financial institution within the Southern District of New York.

**WHEREFORE**, Bryggen Shipping & Trading AS prays:

1.    That a summons with process of attachment and garnishment may issue against the defendant, Petroexport Ltd.; and if defendant cannot be found, then that its goods, chattels and credits within the district, and particularly all bank accounts and other property of Petroexport Ltd. with the financial institutions noted above in paragraph 12, may be attached in an amount sufficient to answer plaintiff's claim;

2.    That defendant Petroexport Ltd. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.    That judgment be entered in favor of Bryggen Shipping & Trading AS and against Petroexport Ltd. in the amount of US$244,546.25 (including estimated interest, expenses and attorneys' fees); and,

4.    That this Court grant Bryggen Shipping & Trading AS such other and further relief which it may deem just and proper.

Dated: New York, New York
      January 4, 2008

                HOLLAND & KNIGHT LLP

By: _____
                Michael J. Frevola
                Lissa Schaupp
                195 Broadway
                New York, NY 10007-3189
                Tel:    (212) 513-3200
                Fax:    (212) 385-9010

                *Attorneys for Plaintiff*
                *Bryggen Shipping & Trading AS*

## VERIFICATION

STATE OF NEW YORK            )

                                      :ss.:

COUNTY OF NEW YORK         )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Bryggen Shipping & Trading AS ("Bryggen"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Bryggen and corresponded with Bryggen's representatives regarding this matter. I am authorized by Bryggen to make this verification, and the reason for my making it as opposed to an officer or director of Bryggen is that there are none within the jurisdiction of this Honorable Court.

_____

Michael J. Frevola

Sworn to before me this
4th day of January, 2008

_____
Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2010

6

# EXHIBIT 1

Page 1 of 4

REVISED

## Frank Ingebrigtsen

| | |
|---|---|
| **From:** | Network Chartering Americas, Eric Koehne [netchar@netchar.com] |
| **Sent:** | 23. april 2007 23:07 |
| **To:** | Network Chartering; 'PETROEXPORT' |
| **Cc:** | netchar; netchar |
| **Subject:** | LS JACOBA / PETROEXPORT CP DATED APRIL 3, 2007 (AMMENDED APRIL 23, -2007) |

**Attachments:** Petroexport shipping terms 2007.doc; LS Jacoba_Questionnaire88.pdf

RE: BIODIESEL EX HOUSTON TO ROTTERDAM / APRIL 25-MAY 10, 2007

PLS FIND BELOW AMENDED RECAP OF FIXTURE DATED APRIL 3 2007

PRIVATE AND CONFIDENTIAL

CHRTRS:     PETROEXPORT LTD.
            340 EAST 64TH STREET
            SUITE 34C
            NEW YORK, NEW YORK 10021

OWNERS:     BRYGGEN SHIPPING AND TRADING - BERGEN, NORWAY - AS T/C OWNERS

VESSEL DETAILS:

| | | |
|---|---|---|
| VESSEL | : LS JACOBA OOS | |
| BUILT | : 2006 | |
| TYPE | : OIL PRODUCTS / CHEMICAL IMO TYPE II | |
| DWT (at extreme draught) | approx : 15500 | |
| GRT | approx : 10300 | |
| NRT | approx :  5000 | |
| $L_{OA}$ | : 148.00 | m |
| $L_{BP}$ | : 139.50 m | |
| BREADTH | :  21.80 | m |
| DEPTH | :  11.30 | m |
| DRAUGHT | :   8.60 | m |
| COATING | : MARINE LINE | |

APPROVALS: BP / STATOIL / REPSOL
           CDI INSPECTED / SIRE REPORT

LAYCAN:     APRIL 25 / MAY 10, 2007

PC:         12,500 MT'S BIODIESEL.
            3-4 GRADES - SEGREGATION FOR ALL PARCELS
            PARCEL 1:     5,000 MT FAME (SME) - VOPAK DEER PARK - SEGREGATED AS: 3,000 AND
2,000 MT
            PARCEL 2:     2,500 MT FAME - MAGELLAN TERMINAL
            PARCEL 3:     5,000 MT FAME (PME) - KINDER MORGAN TERMINAL (HARVEY, LA)
            EACH GRADE 5 PCT MOLOO

LOAD:       2 SB HOUSTON (INTENTION:  VOPAK DEER PARK / MAGELLAN TERMINAL - GALENA PARK)

                 AND 1 SB HARVEY, LOUISIANA (INTENTION:  KINDER MORGAN TERMINAL)

DISCH:          1SB ROTTERDAM

RATE:           USD 65.00 PMT - FOR 10,000 MT'S 3 GRADES
                USD 70.00 PMT - FOR 2,500 MT'S ADDITIONAL IN HARVEY, LA
                PLUS:  USD 60,000 LUMPSUM FOR VESSEL CALLING HARVEY, LOUISIANA
                FREIGHT PAYABLE 3 DAYS AFTER S/R B/L'S

LAYTIME:        175/175 MTPH LOAD/DISCH SHINC REV

DEM.:           USD $20,000 PER DAY / PRO RATA


5% COMM INCL 2.5 PCT ADD

GA/ARB - NYK US LAW

Y/A 94 TO APPLY

LAST CARGOES:       1ST LAST - METHANOL

ETA HARVEY:         PLS ADV
ETA HOUSTON:        MAY 5, 2007
ETA ROTTERDAM:      MAY 23 - 28, 2007 AGW


ASBATANKVOY C/P INCLUDING ADDITIONAL CLAUSES AND PETROEXPORT'S STANDARD TERMS AS AMENDED
BELOW :

 NITROGEN, IF REQUIRED, TO BE SUPPLIED BY CHRTRS AT THEIR TIME, RISK, EXPENSES, OWNERS TO
MAINTAIN THROUGHOUT VOYAGE AT NO EXTRA CHARGE(S) FOR CHRTRS.

- OWNERS AGENTS

- BIMCO ISPS-CLS / AMS-CLS TO APPLY

- ANY TAXES AND/OR DUES ON CARGO AND/OR FREIGHT TO BE FOR
  CHARTERERS ACCOUNT AND SETTLED DIRECTLY BY THEM.

- CONOCO WEATHER CLAUSE TO APPLY.

- BUNKERING CLAUSE : BUNKERING TIME NOT TO BE DEDUCTED FROM
  LAYTIME UNLESS IT DELAYS COMMERCIAL OPERATION.

- ANY TIME AND EXPENSES FOR OBTAINING A VALID COC (CERTIFICATE
  OF COMPLIANCE) TO BE FOR OWNERS ACCOUNT. TIME SPENT IN
  OBTAINING A VALID COC NOT TO BE DEDUCTED FROM LAYTIME UNLESS
  IT DELAYS COMMERCIAL OPERATIONS.

- VEGOIL TANK PRE-WASH CLAUSE

(A) IF FOLLOWING DISCHARGE OF THE CARGO THE VESSEL IS REQUIRED TO PRE-WASH ITS CARGO TANKS
PRIOR TO LEAVING THE DISCHARGE PORT IN ORDER TO COMPLY WITH MARPOL 73/78 ANNEX II OR ANY
OTHER NATIONAL OR LOCAL LAWS OR REGULATIONS, THE CHARTERERS SHALL PAY COMPENSATION IN AN
AMOUNT EQUIVALENT TO THE RATE OF DEMURRAGE STIPULATED IN THE CHARTER PARTY FOR ALL TIME
AFTER COMPLETION OF DISCHARGE UNTIL THE COMPLETION OF WASHING AND DISPOSAL OF THE TANK
WASHINGS AND/OR CARGO RESIDUES. THE DISPOSAL OF TANK WASHINGS AND/OR CARGO RESIDUES SHALL
BE ARRANGED AND PAID FOR BY THE CHARTERERS.

(B) IN THE EVENT THAT THE VESSEL IS ORDERED TO VACATE THE DISCHARGING BERTH TO PERFORM THE
PRE-WASHING OF ITS CARGO TANKS AS PROVIDED UNDER SUB-CLAUSE (A), ANY SHIFTING EXPENSES SHALL BE
FOR THE CHARTERERS' ACCOUNT.

24 04 2007

↔

AMENDED PETROEXPORT LTD STANDARD CLAUSES 1-24
----------

02. DELETE (AS PER MAINTERMS)

03. DELETE - SAME IS CHRTRS RESPONSIBILITIES, VESSEL IS FULLY
        DESCRIBED IN MAINTERMS AND AS PER Q88

06. INSERT IN LINE 2 "175" AND "175"

    DELETE, IN PARAGRAPH 2, AS FROM "SHIP'S CREW TO CONNECT..."

07. DELETE - NITROGEN CLAUSE TO BE AS PER MAINTERMS.

12. INSERT IN LINE 1 AFTER "PRE-INSPECTION", INSERT "BY INDEPENDENT
    SURVEYOR(S)"

16. DELETE AS FROM "IN ADDITION OWNERS CAN NOT CARRY ANY COMPETING CARGO ON BOARD."

17. INSERT AT THE END, AFTER "USED LAYTIME", INSERT "UNLESS SUCH
    DELAY(S) IS FOR REASONS SOLELY ATTRIBUTABLE TO THE CHARTERERS OF
    THIS C/P, WHEN FULL TIME TO COUNT TOWARDS CHARTERERS OF THIS C/P.

19. INSERT IN LINE 2 AFTER "DULY SIGNED", BEFORE "TIME", INSERT
    PROVIDED OBTAINABLE.

    DELETE IN LINE 3 "60", REPLACE BY "90"

20. DELETE AS FROM:  "SHOULD VESSEL / MASTER..."

21. OK, BUT PLS ALSO INSERT OWNERS PROTECTIVE CLAUSES AS FOLLS:

    WHEN STS, LIGHTERING, OPEN SEAS BERTHS AND AT BOUYS THEN ANY DELAYS
    DUE TO BAD WEATHER A/O SEA CONDIDITIONS SHALL COUNT IN FULL AS USED
    LAYTIME OR DEMURRAGE IF VESSEL ON DEMURRAGE. OWISE CONOCO WEATHER
    CLAUSE TO APPLY. WHEN VESSEL IS SHIFTED DUE TO BAD WEATHER, THEN
    SHIFTING EXPENSES TO BE FOR CHARTERERS ACCOUNT AND SETTLED DIRECTLY
    BY THEM.

    WHEN STS, LIGHTERING, OPEN SEAS BERTHS AND AT BUOYS THE STAND-BY
    TUGS, IF ANY, TO BE FOR CHTRTRS ACCT AND SETTLED DIRECTLY BY THEM.

    · ANY AND ALL STS EQUIPEMENT REQUIRED FOR SAFE STS TO BE SUPPLIED AND
    PAID FOR BY CHRTRS AT THEIR TIME/EXPENSE, ALL AS PER OCIMF GUIDE TO
    STS TRANSFERS.

END RECAP

PLEASE CONFIRM ALL IN ORDER.

THANK YOU VERY MUCH FOR YOUR SUPPORT.

Best Regards;

24.04.2007

**Network Chartering Americas Inc.**

**Office:** ++ 1 713 626 3226
**Mobile:** ++ 1 713 298 1328
**Fax:** ++1 713 623 0547
**email.** netchar@netchar.com
**yahoo id:** eric_koehne

24.04.2007

# EXHIBIT 2

A5.7    APPENDIX 5: FORMS

## ASBATANKVOY CHARTERPARTY

Association of Ship Brokers
& Agents (U.S.A.), Inc.
October 1977

CODE WORD FOR THIS
CHARTER PARTY:
ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

**PREAMBLE**

|  | Place | Date |
|---|---|---|
|  |  |  |

IT IS THIS DAY AGREED between _____

chartered owner/owner (hereinafter called the "Owner") of the _____

SS/MS _____ (hereinafter called the "Vessel")

and _____ (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble

and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

**PART I**

A.  Description and Position of Vessel:

Deadweight:          tons (2240 lbs.)          Classed:

Loaded draft of Vessel on assigned summer freeboard          ft.    in. in salt water.

Capacity for cargo:          tons (of 2240 lbs. each)          % more or less, Vessel's option.

Coated:     ☐ Yes     ☐ No

Coiled:     ☐ Yes     ☐ No          Last two cargoes:

Now:          Expected Ready:

B.  Laydays:

Commencing:          Cancelling:

C.  Loading Port(s)

Charterer's Option

D.  Discharging Port(s):

Charterer's Option

E.  Cargo:

Charterer's Option

F.  Freight Rate:          per ton (of 2240 lbs. each).

G.  Freight Payable to:          at

H.  Total Laytime in Running Hours:

ASBATANKVOY CHARTERPARTY                          A5.7

I.    Demurrage per day:

J.    Commission of        % is payable by Owner to

      on the actual amount freight, when and as freight is paid.

K.    The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.    Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.    Special Provisions:

      IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of:                    _____

                                        By: _____


Witness the Signature of:                    _____

                                        By: _____


1197

**PART II**

1. WARRANTY—VOYAGE—CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.

(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

| | *On a voyage to a port or ports in:* |
|---|---|
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| *Place* | *On a voyage to a port or ports in:* |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTER | Mediterranean (from Western Hemisphere). |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. SAFE BERTHING—SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into the Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES—TAXES—WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritimo. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo),

or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:—Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING

(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge—the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

ASBATANKVOY CHARTERPARTY                                      A5.7

including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charge for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purposes of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterers, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

17. (a). QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or decks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's inspector. The Vessel shall not be responsible for any admixture of more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from—any act, neglect, default

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storeperson.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet this Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from emulsi-dated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or commingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of this Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the heated portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried but the said voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

BILL OF LADING

Shipped in apparent good order and condition by _____

                                                                                                                                 Steamship
on board the _____     Motorship

whereof _____ is Master, at the port of _____

_____

_____

_____

_____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

or order on payment of freight at the rate of _____

                                                                                    contract
This shipment is carried under and pursuant to the terms of the charter dated New York/London

                                                                    contract
between _____ and _____

Charterer, and all the terms whatsoever of the said charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading
of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of _____

                                                                                      _____
                                                                                                       Master

Form 30-16S Printed and Sold by UNICO 190 Baldwin Ave., Jersey City, NJ 07306 - (800) 631-3098

# EXHIBIT 3

# Petroexport Ltd.

## Standard Charter Party Clauses
## 1 through 24

**1. I.T.O.P.F.**
Owner warrants that they are a member of the International Tanker Owners
Pollution Federation Ltd. (I.T.O.P.F.) and will remain so for the duration of this
Charter Party.

**2. Vessel Approval**
Owner warrants that the vessel(s) nominated under this Charter Party at all
times shall be accepted by all major oil companies (e.g. BP, Shell, Exxon) and
chemical companies and has been CDI inspected. Owner to arrange for
inspections as and when required at their time and expenses.

**3. Load and Discharge Port Restrictions**
Owner warrants that they are fully aware of the physical and operational
restrictions at nominated load and discharge ports, terminals and berths, and
will abide by same. Possible restrictions include but are not limited to:
physical limitations on the vessel draft, length, beam, displacement, etc; and
restrictions on nighttime cargo operations, navigation and/or berthing. Any
delay and/or additional costs incurred due to non-compliance with restrictions
shall be for Owner's account.

**4. Vessel Suitability Clause**
**A.**
Vessel to be classed 100 A.1 Lloyd's register (or equivalent) for all time she will
be under this Charter party. Any extra insurance and / or governmental
charges on cargo and / or ship, if any, on account of Vessel's age and / or class
and / or flag and / or ownership to be for Owner's account. Owners warrant
that the Vessel and its equipment complies with all mandatory international
regulations being in force at the date of this Charter Party applicable to the
contracted voyage and cargo, and that the Vessel has on board the necessary
valid certificates for this Charter Party. Owners warrant that the Vessel
/Owners are members of a first class P & I Club and will remain so during the
currency of Charter Party.

**B.**
Owner / Vessel to comply with all United States Coast Guard and OPA
regulations, including such regulations pertaining to Alcohol, drugs and drug
testing. Any loss, claim or action resulting from Owner/Vessel's noncompliance
shall be Owner's responsibility, and any resulting delay not to count as used
laytime or demurrage.

**C.**
Owner warrants that this vessel (or sub) complies fully with the ISM Code and is in possession of a valid Safety Management Certificate and will remain so for the entirety of her employment under this charter party. Owner will provide Charterer with satisfactory evidence of compliance if required to do so.

Without prejudice to any rights or remedies available under the terms of this charter or under U.S. Law, in the event of a breach of the above undertaking any loss, damage, expense or delay following there from shall be for Owner's account.

**5. Last Cargo Clause**
Last three (3) cargoes to be clean / unleaded and suitable for the safe carriage of specified cargo of Part I / Clause E

**6. Pumping / Terminal Clause**
Owners warrant that the vessel is capable of receiving / discharging the entire cargo at a rate of _____ metric tons per hour at load, _____ metric tons per hour discharge (laytime as agree in fixture to be entered) or maintain 100 P.S.I. at the ship's rail, provided the shores facilities permit. Any claim in respect to excess pumping time shall be accompanied by an hourly manifold pumping log countersigned by both Masters and Receivers if obtainable, failing which such claim shall be null and void.

Discharge terminal will have the right to gauge pressure. Ship's crew to connect and disconnect hoses if permitted by local regulations at loading / discharging port at Owner's risk and expense.

**7. Nitrogen Clause**
If a nitrogen blanket is required by the Charterer, the Charterer shall supply the initial nitrogen blanket and the Owner shall maintain a nitrogen blanket during transit and discharge of Charterer's cargo. The Owner shall furnish documented proof that the vessel provided regular and routine nitrogen maintenance as required under this Clause. Upon request, a copy of the log shall be supplied to the Charterer.

**8. Address Commissions**
An address commission of 2.5 percent on all monies under this Charter Party (including freight, deadfreight and demurrage) shall be paid to Petroexport Ltd. Such address commission to be separated out on the freight invoice and deducted from the freight due.

**9. Shifting Clause**
Shifting time from anchorage and / or waiting berth to loading or discharging berth not to count as laytime, even if on demurrage.

**10. Wharfage / Dockage**
Wharfage and / or dockage, if any, for Owners account

**11. Confidentiality Clause**
It is agreed that all negotiations terms and conditions of this Charter Party shall remain strictly private and confidential.

**12. Independent Inspector Clause**
Should a vessel which is scheduled for loading fail the pre-inspection, the Owner of the vessel shall be required to pay for the cost of any subsequent inspections by the Charterer's Inspector at the load berth/port. Owners will also be responsible for other additional cargo operations costs including overtime if any that Charterer may incur due to vessel failing pre-inspection.

**13. Heating Clause**
If Charterers require cargo heating, the Vessel shall throughout the voyage and the entire discharge maintain the cargo at the loaded temperature or at the temperature stated in the Charter Party agreement, whichever is the lower.  If requested by the Charterer and if the length of the voyage allows, vessel shall increase and maintain the temperature of the cargo from the loaded temperature to a temperature specified by Charterer, and Charterer shall pay for extra bunkers consumed solely in increasing the temperature as aforesaid at Owner's documented actual replacement cost for such bunkers at the port where bunkers are next taken.  If vessel fails to maintain the temperature of the cargo as requested by the Charterer, Charterer shall have the option to hold Vessel off berth and / or to suspend discharging until the cargo is properly heated.  All time and expense in connection with the foregoing being for Owner's account.

**14. Vapor Control Clause**
For nominated terminals in the USA where vapor control is required, Owners warrant that nominated vessels will comply with all applicable USCG Regulations.  For all other locations where nominated cargoes are required by law to be loaded using vapor control, Owners warrant that nominated vessels will comply with all local regulations and will additionally comply with the vapor control requirements of the International Bulk Code.

**15. Tank Suitability Clause**
The Charterer's part cargo is to be loaded into and carried in stainless steel tank(s) or suitable coated tanks in Owners option.  Vessel to arrive at load port(s) with all cargo tanks, pumps and pipes suitable clean to Charterer's Inspector's satisfaction and Owners to ensure that all traces of sediment, tank washing or chemical, if used, are removed from tanks, pumps and pipes intended for carriage of designated cargo.  Any delays or expenses as a result of Vessel arriving at load port(s) and not being in a suitable condition to load

the designated cargo to be for Owner's account, and such time, expenses not to count against Charterer.

### 16. Rotation / Completion Segregation Clause
The Owner has the right to carry completion cargo for own and / or outside account, but guarantees to give full and complete segregation to the part cargo referred to in Clause "E" hereof and to use a separate line and pump for it. Rotation of loading and discharging ports to be in Owners option however always in geographical rotation.  In addition Owners can not carry any competing cargo on board.

### 17. Laytime Suspension Clause
In the event of Vessel being delayed in berthing and the Vessel has to load and / or discharge at the berth(s) for the account of others, and terminal(s) cannot load / discharge all grades simultaneously, then such delay and / or waiting time if incurred shall not count as used laytime.

### 18. Y/A General Average / Arbitration Clause
York / Antwerp rules 1994, General Average / Arbitration to be New York / U.S. Law

### 19. Time Bar Clause
Charterer shall not be obliged to pay any claims unless such claim, along with supporting documents (including but not limited to Vessel's duly signed time sheets and terminal logs) is received by Charterer within 60 days from completion of discharge.

### 20. Eta Clause
Vessel / Master to give ETA notices to the Charterer and all other parties (as instructed in voyage orders) immediately upon sailing prior discharge port and / or Charterer's load port(s).  Thereafter Vessel / Master to provide 5/4/3/2/1 days + 12 hours ETA notices in advance at either Charterer's load or discharge port(s).  During laden voyage Master to give ETA's every Monday / Wednesday / Friday.  Should Vessel / Master fail to comply with this clause and any delay at either port(s) result in any such delay(s), time shall not be for Charterer's account.

### 21. Board to Board Transfer Clause
Charterers will always have the option to load by ship / barge transfer at a safe anchorage and / or berth at their own risk and expense.

### 22. Prorated Waiting Time Clause
In the event of Vessel being delayed in berthing and the Vessel has to load and / or discharge at the berth(s) for the account of others, then such delay and / or waiting time and / or demurrage, if incurred, to be prorated according to the Bill of Lading quantities.

**23. Letter of Indemnity**
Should Bills of Lading not arrive at the discharge port(s), Owners are to discharge and release the entire cargo against a Letter of Indemnity provided to Charterer in accordance with Owners P & I Club wording.  No bank guarantee required.

**24. Administration Clause**
No formal written and signed Charter Party will be prepared unless specifically requested by either party.  Charter Party terms and conditions are evidenced by the broker's fixture confirmation E mail in conjunction with written approval of the E mail by both the Owners and the Charterers, each party confirmation agreement by their authorized representative within two (2) working days by E mail or the other party through the fixing broker.

# EXHIBIT 4

Petroexport

## *DEMURRAGE CALCULATION*

| | | | |
|---|---|---|---|
| **VESSEL** | Ls Jacoba | **VOYAGE NO:** | voy 07-01 |
| **CHARTERER** | Petroexport | **C/P DATE:** | 3-apr-07 |
| **CARGO** | 2011,419 mt linseed oil | **FIX. NO** | |
| **INV. NO** | | **YOUR REF** | |

**LOADING IN**            Houston

| | | | |
|---|---|---|---|
| **N.O.R. tendered** | 06.05.2007 18:30 | | |
| **Vessel berthed** | 10.05.2007 03:40 | | |
| **Hose connected** | 10.05.2007 09:30 | | |
| **Loading commenced** | 10.05.2007 11:20 | | |
| **Loading completed** | 14.05.2007 18:20 | | |
| **Hose disconnected** | 14.05.2007 18:55 | | |
| | | | |
| **Time counting from** | 06.05.2007 18:30 | | |
| **Time counting to** | 14.05.2007 18:55 | **192 hrs** | **25 min** |

| | | | |
|---|---|---|---|
| Less notice | | 6 *hrs* | 0 *hrs* |
| Less prorata waiting time | | | |
| petroexport 5000 m/t adm 2011,419 mt | | | |
| NORT+6h 7/5 00:30-anchor awelgh 9/5 21:25=68,9167 | | | |
| 68,9167 hrsx5000/7011,419= 49,146 | | | |
| ttl waiting 68,9167 less P.Exp.share 49,146 = 19,77 | | 19 *hrs* | 46 *min* |
| Less shifting 9/5 21:25-10/5 03:40) | | 6 *hrs* | 15 *min* |
| Less shifting from anchorage to magelian | | 6 *hrs* | 15 *min* |

**LOADING IN**            Delta harvey

| | | | |
|---|---|---|---|
| **N.O.R. tendered** | 16.05.2007 12:15 | | |
| **Vessel berthed** | 17.05.2007 02:10 | | |
| **Hose connected** | 17.05.2007 05:00 | | |
| **Loading commenced** | 17.05.2007 08:30 | | |
| **Loading completed** | 19.05.2007 12:30 | | |
| **Hose disconnected** | 19.05.2007 14:00 | | |
| | | | |
| **Time counting from** | 17.05.2007 02:10 | | |
| **Time counting to** | 19.05.2007 14:00 | **59 hrs** | **50 min** |

| | | | | |
|---|---|---|---|---|
| | | **214** | **-1** | |
| **Net time used loading** | | **213 hrs** | **59 min** | **213,983 hrs** |

**DISCHARGING**            Rotterdam

| | | | |
|---|---|---|---|
| **N.O.R. Tendered** | 06.06.2007 15:00 | | |
| **Vessel Berthed** | 06.06.2007 18:10 | | |
| **Hose connected** | 07.06.2007 11:40 | | |
| **Discharging commmenced** | 07.06.2007 22:50 | | |
| **Discharging completed** | 11.06.2007 22:15 | | |
| **Hoses disconnected** | 11.06.2007 22:50 | | |
| | | | |
| **Time counting from** | 06.06.2007 18:10 | | |

Page 1

Petroexport

| | | | | |
|---|---|---|---|---|
| **Time counting to** | **11.06.2007 22:50** | **124 hrs** | **40 min** | |
| | | *124* | *40* | |
| **Net time used discharging** | | **124 hrs** | **40 min** | **124,667 hrs** |
| | | | + | |
| **Total time used** | | | | **338,650 hrs** |
| **Less time allowed** | | **hrs** | **min** | **146,080 hrs** |
| 12782,73/175x2 = 146,08 | | | | |
| **On demurrage** | | | | **192,570** hrs |
| **at a rate of** | **$20.000,00** | | | **$160.475,00** |